14-4231 Michael Williamson v. Recovery Ltd Partnership at all. Arguments not to exceed 15 minutes per side. Mr. Rensselaer for the account. My name is Jason Winter and I stand before you as legal counsel for Richard T. Global Esquire. I would respectfully reserve five minutes for rebuttal. You may. I'd like to begin by articulating the singular principle which I respectfully submit should guide this court in its consideration of this matter. And that is that when an attorney explains to his client repeatedly both in writing and verbally and in no uncertain terms the importance of complying with a court order, confirms that actions are being taken by the client to comply with that court order, has the client certify under oath to the court compliance with that court order, and then receives an order from the court confirming compliance with the prior order, that such is sufficient to defeat any suggestion of sanctionable conduct on the part of the attorney as it relates to compliance with that order. I submit that what brings us here today is a mistaken and unsupported belief that in 2007 Mr. Roble decided to help Tommy Thompson hide certain copies of inventories even though, according to Robert Evans, the subject copies are not materially different from what had already been produced. Such a belief is illogical, it is not supported by the record evidence in this case, and I respectfully submit it should not serve as the basis for the imposition of sanctions. So when you say that the subject copies were not materially different from what was already produced, what was already produced was the inventory of what was sold to what, California Gold? Correct, Your Honor. And there had been other things that had been produced, for instance inventories from the Sotheby's auction and the Christie's auction. And the, quote, subject copies are, for example, what's labeled as the master bar and coin inventory, I have a copy, something like 8990, and these 3x5 cards and disks and that sort of thing? Correct, Your Honor. Mr. Evans' testimony was that in 2013 when those were discovered, even he, and he had been the curator, if you will, for the company, even he had forgotten about these prior copies, but he testified that there had been one inventory that had been updated from time to time. But your recitation, Your Honor, is accurate. And in saying that they are not materially different, is there a particular document or person who compared the two side by side and says this, or is that an assertion, or where would we look for the truth of that? I would respectfully refer the court to the examination of Mr. Evans in the district court hearing on the sanctions, in particular the cross-examination by Mr. Robles' counsel in those proceedings, Mr. O'Shaughnessy. And what, Evans says they're not materially different? He indicates that while there may have been minor distinctions between them, that by and large they were substantially identical. And that's a paraphrase, Your Honor. The testimony obviously will speak for itself in that regard. Did somebody testify to the contrary? I mean, the receiver apparently, when they got these filing cabinets, seemed to think that they were documents that he had not seen or had not previously had. Well, the documents may have been different documents because there were distinctions. However, I will submit to the court that there is a dearth of evidence in the record in this case that there was any material distinction that in any way was causally related to holding up the proceedings. And that jumps to another issue in this case, Judge, is that if we put aside for the moment the suggestion of whether or not these items should have been recalled by Mr. Robles and should have been produced in 2007 as opposed to when they were found in 2013, there is an issue that remains. And that is, what was the implication of this alleged delay and what is the true measure of damages for the appellee in this case? And I will submit that one of the areas where Judge Marbley's opinion is lacking with all due respect is that there is no analysis that has gone through in terms of what I will refer to as the causation element. And that is, what was the actual implication of this alleged six-year delay in the production of these as it relates to the ongoing proceedings? I will submit that in the absence of record evidence in that regard, that an insufficient basis exists for the order of sanctions. Further, I will remind the Court that when we look at the measure of damages in this case, the equities militate heavily in favor of, if not a reversal on the merits of this sanction award, but a significant reduction in the award as there is a substantial windfall that appears to be the product of this award. You will recall that there was a $700,000 settlement that was reached before Mr. Kirk and Mr. Ford went forward in their roles as respondents in the sanctions motion. As we understand it, it appears that if this award sticks, it will result in a significant windfall in terms of looking at what the actual economic costs were to the appellee of the alleged sanctionable condom. I was just going to say, is that really important when you're talking about a sanction order for failure to disclose things at a certain time? I mean, assuming your client did not, or purposely did not disclose, what difference does it make? It violated a court order. If one is to assume, Your Honor, and obviously in this case that's a big assumption, but if one is to assume that the court is to determine that my client acted in a sanctionable way, and we look in a vacuum at what the appropriate range of damages are in this case, I submit to the Court that equities militate heavily in favor of looking at what the actual damage was that was caused by that. I do submit to the Court that that is a highly relevant consideration for the Court. And, in fact, you'll remember from Judge Marvin. You didn't answer my question. I said, why is it? Why is it? I would respectfully submit that the basis for our system has to do with the proportionality of sanctions and punishments as opposed to the harm. And if one is to say that the harm is X and we're going to award four times X as the punishment, I would submit to this body that that would be excessive and that would be inappropriate. In that regard, I would ultimately... Isn't there a law that sanctions for this type of conduct, assuming that that's upheld, can be punitive, that it's an attack on the system of justice if we can't rely on officers of the court? And even if it only costs opposing counsel $100,000, you can go above that for punitive purposes. There is authority for that, Your Honor. However, the issue is where is that dividing line? I would submit to the Court that, in this case, there's insufficient evidence in the record to support the imposition of a four-fold sanction. If I may return quickly as my time is eroding to the merits, let me say clearly and without equivocation, Mr. Roble did not know in 2007 that there were other copies of inventories that existed beyond what his client certified had been turned over to the other side. You made a statement earlier when you were running through these certifications about a court order confirming, it sounded like you said confirming, that Mr. Roble had, in fact, done everything he was supposed to. Which order are you referring to? Judge, I was referring to the order of satisfaction that indicated that the terms of the consent agreement that called for the production of those inventories had been complied with. It was not specific, if I may, to Mr. Roble, because you'll recall Mr. Roble was not actually a party who was ordered to certify anything. His client was ordered to certify that, and they, in fact, did, along with their accountant and along with other individuals. What was the date of that order of satisfaction approximately? Your Honor, the date escapes me currently. I know the certification occurred in April of 2007 and the second certification in June of 2007. That's all around 2007. By my right, you said that he didn't know certain things in 2007, but would not his obligation have continued, even if we assume, let's assume for the moment, that in 2007 he had a senior moment, but because they were there until 2013, he would have had a continuing obligation if he suddenly remembered them all along. Is that correct? Well, I would agree, Judge, that the duty is ongoing. However, what I will point out is that the record evidence supports the contention that between 2006 and 2009, nobody knew where these documents were. And, in fact, there's no record evidence to support the contention that what was found in 2013 in 431, which was the other side of the duplex from where my client's office was, was there in 2007, and that's critical. And if I may take 10 seconds before I cede to stress this, this is a brick duplex. 431 in the basement is where these cabinets were found in 2013. I saw some reference that there were 30 on that side and four or six on the other side. Is that right? There were 36 total, Judge. My recollection is that they were found in 431, but I will defer to the record on that. The testimony of Mr. Henson is that during that 2006 to 2009 period, that there were a lot of documents that were moving around for the companies in and out. Multiple people had access to this property between 2007 and 2013. And so what there is not a scintilla of record evidence to support is a suggestion that what was found in 2013 in those documents was, in fact, there in 2007. When did your client become the owner of the property? Your Honor. He owns both sides or did? He did, and then he immediately leased it back to the companies, and they used it for their office space. I believe, if I recall, that it was around 2001 that he took in exchange for these. Okay, so he had it from way before. He had had it for a while. Thank you, Counsel. You have your five minutes for rebuttal. Thank you. May it please the Court. Good afternoon, Your Honors. I'm Steve Tigges. It's my privilege to come before the Court representing the Dispatch Printing Company. Let me begin with 30 seconds of quick background to put this in context. Over 200 business leaders from Columbus invested $12.5 million in the defendant's venture. My client invested $1 million. The family that owns my client individually invested another $500,000. Using those investors' monies, the defendants recovered a treasure worth in excess of $100 million, perhaps as much as $200 million. The investors never saw a dime. They also never received any explanation for what happened to their money or what happened to their treasure, and that's why this case was filed, to answer those questions. Mr. Winter has told you today that the inventories that were produced were not materially different than the ones that were not produced. That is inaccurate, Your Honors. In order to answer the questions that were presented by this case, we needed four different sets of inventories. First, the inventory of what was recovered from the shipwreck. Bear in mind, much of what was recovered were coins that were encrusted into clumps, and you couldn't tell exactly how many coins were in each clump, but that's the first list. The second was the inventory of what was deposited with the Virginia Admiralty Court after the coins were curated, after the crusts were broken off and the coins were separated. Materially different because now, whereas you had one clump, you could have had 20 or 30 separate coins. The third... Thompson disappeared. He did. Didn't he show up in Florida or something like that? Boca Raton, Florida. Yeah, okay. Yes. He was caught there. Yeah, right. He showed up, yes. He was caught there, right. You've never, or any of the investors in the case, recovered any money here, and I respect the fact that you pursued the investment with a great deal of hard work and fees, but it seems to me that, and I respect the fact that there was a hearing, that these were important matters that would reveal what your clients were entitled to, but at the end of the day, there was no recovery, and there's abundant evidence that Mr. Robel appears to have done all he could to get his clients to turn the materials that were ultimately found over to you, your clients, and the rest of the lawyers. In light of the fact that nothing was recovered and expenses went down, why should you be entitled to anything from Mr. Robel if, in fact, Judge Marbley went too far in finding that Robel was motivated by impropriety? I mean, I think that's what we need to talk about, right? The damages, if you will. No, the merits. We have to determine the fact, in light of the fact that there's really no harm at the end of the day, right? Your Honor, there is indeed harm at the end of the day. First of all, the audit process that was pursuant to the consent order where these inventories were supposed to have been produced. Okay, but you audited what? To get what? Ultimately, the auditors couldn't conclude anything because the process was subverted by the failure to produce, among other things, these inventories. So you've got a criminal action, you've got a judgment, you've got all these things against Thompson. But if Robel did his best... I would take issue, Your Honor. Well, that's what I think we ought to talk about. And that's where I'm going here. I was addressing a materially different issue, and I'll come back to that later. Okay, go ahead. In the district court, Mr. Robel said the same thing you heard his lawyer say here today. He did not know there were these other inventories. Judge Marbley had the opportunity to listen to Mr. Robel's testimony, to assess his demeanor as a witness to judge his credibility, and Judge Marbley plainly, clearly found Mr. Robel was not credible, not believable when he said he did not know. Judge Marbley found, and I quote, Robel himself was aware of the existence of other inventories. Another quote, Robel was personally aware that responsive documents exist which have not been produced. A third quote from Judge Marbley's opinion, Robel had, quote, first-hand knowledge of the falsity of his statements. Those were the court's findings after listening to the witness, judging his credibility, and deciding who to believe. Those findings are support... Yes, Your Honor. I take your argument there. Your adversary at least spent somewhat more of his time than I expected saying that, in fact, these inventories that were discovered in 2013 were not materially different from the ones that were produced, I guess especially what was sold to California Gold. Now, was there either a document or a piece of testimony saying, okay, here is the 8990 bar and coin inventory to take one example, and we lay it beside the California Gold inventory, and here's what's in this one that's not in that one. Mr. Evans testified about the historical progression of these inventories and went through step by step because what happened, I covered the first two inventories, what was found, what was deposited with the court. The third was the inventory of the treasurer that was left with Recovery Limited Partnership after the settlement with the other claimants in the admiralty litigation. There was a split of the treasurer and the claimants, the insurance companies, took approximately 7% to 8% of the treasure for themselves. And then the fourth inventory is the one of the sale to California Gold. Those are all different inventories showing... But I would assume, and this is perhaps taking off from what Judge Murphy said, that the upshot of this would be to say that somewhere there's this inventory of something that's this big, and the stuff that we know where it went is only this big, so here's the other items that are hidden in the inventories. Is there any testimony that that's actually what happened? That is essentially what Mr. Evans did and what he explained. He went through the process to track where it started in the beginning and what he found. So we should look to Evans' testimony to confirm or refute the allegation that they're substantially similar because... I believe so, Your Honor, and the inventories themselves. I mean, I know they're massive documents, but they speak on their face. They show they're different, and they're necessarily different because so much of it went to the insurance companies, and so there was that much less to be sold to California Gold. If what the insurance companies got and what California Gold got exhausts what came up from the ship, then there's no hidden gold. On the other hand, if earlier inventories show lots of items that didn't go to either place, then you've got a real gripe. That is what KPMG was endeavoring to determine, but they were only given that last inventory, the one that Mr. Robles said that was the only one he knew about. They never received the other ones. They never could do the comparison that you're describing. Okay, but now you or somebody collectively can or would have testified to. I'm a little fuzzy on that. And Mr. Evans is the person that did that comparison now that all the documents were available, and he addressed how that progression proceeded from one stage to the next. Yeah, but I'm not so interested in the progression as whether there's stuff that was on the earliest inventories that doesn't show up on the latest inventories. I don't believe that happened, Your Honor. Okay. But back to my point to answer Judge Murphy's questions. The record fully supports the findings that Judge Marbley made that Mr. Robles had firsthand knowledge of these other inventories. There's the letter that he wrote to Bank One in closing an inventory. There is the docket and the pleadings from the Virginia Admiralty case in which Mr. Robles was the trial attorney, showing repeated proceedings before the court in Virginia regarding inventories that were deposited with the court that were shared with the insurance companies. There was the testimony of Mr. Robles' co-counsel from the Virginia Admiralty case where he acknowledged that he and Mr. Robles together attended proceedings where the inventories were, in fact, the subject of discussion. That's Mr. Elliott? Mr. Elliott, correct, Your Honor. There was the testimony from Mr. Evans, the curator of the treasure, who said that Mr. Robles knew that Evans was keeping these inventories. In fact, Mr. Evans identified a memo that he wrote in which he noted that he had discussed his revisions to the inventory with Mr. Robles. There were Mr. Robles' own admissions in his testimony. There were three of them, at least. Judge Marbley asked Mr. Robles directly, question, you searched some files for the inventories. Specifically, you searched some files for the inventories. Mr. Robles said, correct. I asked him, you knew, did you not, that your clients had at one time or another possessed other inventories other than the California gold one? You knew that to be true, did you not, sir? His answer, I think at points in time I would have been aware of this. Question, did you know that Bob Evans was the person in charge of keeping the inventory? Answer, I knew that Bob was involved in keeping the inventory while he was with the company. And then lastly, and perhaps the most important piece of evidence, is the testimony that was given by the receiver's financial advisor, James Henson, who attended a meeting with Mr. Robles and others after the files were discovered in Robles' basement. And Mr. Henson said this, question, did Mr. Robles say anything? Answer, Mr. Robles said, so you found these inventories? We said, yes, we found them. And he referenced that the inventories were part of the materials that Mr. Thompson had not wanted turned over to the court as part of the court proceeding. Did he say why? Answer, yes, he, Mr. Robles, said that Thompson had great concerns about secrecy and confidentiality and therefore didn't want to share materials unless he was absolutely forced to. Mr. Robles said Thompson told him not to turn these over. He clearly knew about them. Judge Marbley found that. There's abundant evidence in the record to support that conclusion. Mr. Elliott, I think, is the one who you cite as saying an inventory was submitted to the Virginia court in camera in 1993 or thereabouts. Correct. Was that document ever produced from the Virginia court records? Or was any of these other inventories identified as being the one referred to as submitted in camera? I don't know if that's ñ there was an inventory referred to as the Holabird inventory. Sorry, Holabird? Holabird. It was prepared by a gentleman by the name of Fred Holabird for the Virginia court. He was commissioned by the court. I don't know if his inventory is the 1993 one or a later version. I just don't know the answer to that. But, in fact, one of the inventories that were found in Mr. Robles' basement was a copy of the Holabird inventory, even though he had told the district court when Judge Sargas had the case that the Virginia court had the only copy in existence. So you refer to his basement, this is the whole business, it's a basement somewhere in this 431, 433 structure. Correct, Your Honor. And am I right that there were some, because I saw the reference to 30 file cabinets in the other side, but that 4 to 6 were in, quote, his side. Is that your recollection of the record? Actually, it is, and it's a little more complicated than that. Many things are. It is. It's a duplex with two sides called the 431 side and the 433 side. Initially, the company, RLP, had its office on the 433 side. That was in 2004 when Mr. Robles took ownership of the property. Then in 2007, Mr. Robles moved his law office into the 433 side and the company moved to the 431 side. And at that time the file cabinets were scattered throughout both sides of the building. Then in 2010, Mr. Robles' son started living in the 431 side as his apartment, and at that time his son and friends of his moved the cabinets to where they were found by the receiver in 2013. Certainly by 2010, neither side was being used as any kind of ongoing office by the companies. Correct, exactly, exactly. And so then to answer your question, Judge Boggs, when the receiver got there in 2013, there were 30 cabinets on the 431 side in the basement. There were four cabinets in the basement on the 433 side, and then there were the final two on the third floor of the 431 side. Based on that testimony about the son and his friends moving them around, the fact as to where they were found was at least arguably adventitious in terms of that's the way they wanted to have access to space or something. That's a fair point, Your Honor. I'd also mention another piece of Mr. Evans' testimony that was significant. Mr. Evans left. He was the keeper of the inventories, and if you've seen the stack, it's three foot high probably, as well as what was on the computers and the disks and everything else. He left the company in 2000. He testified that when his office was at the 431, 433 building, as was Mr. Robles at the time. When he left in 2000, he testified those inventories were right where he'd left them behind, in his files, in that building. He then started working for the receiver in 2013 after the receiver was appointed, and he testified those are the same inventories were found in 2013 that were there when I left in 2000. Now, Mr. Robles makes this argument, well, how do we know they were there in 2007 and 2008? Well, they were there in 2000 and they were there in 2013, but the more important point is, Your Honor, as Judge Marbley found based on the evidence in this record, Mr. Robles knew there were other inventories, so whether they were in the basement or the 431 side or the 433 side or at some other place, he knew they existed. Counsel, I think your time's expired unless your colleagues have further questions. Thank you. Thank you. Mr. Wetter, you have your five minutes for rebuttal. Thank you, Your Honor. Mr. Zekas and I can agree on one thing, and that is that we would be able to refer the Court to Mr. Evans' testimony for an appropriate discussion concerning Let me make an observation. It seems that the most difficult hurdle you have to overcome is the standard here. I mean, we hear and are reading in the briefing diametrically opposed explanations for what happened here, and you took a very strong position on your client's knowledge, which is understandable. Mr. Tigges took quite the contrary. But the reason why we must step back unless we find that Judge Marbley was on some sort of, you know, I don't know, excessive effort to punish your client, it seems to me that all of these cases, starting with Garner, say that a trial court is the place where these decisions are supposed to be made, and unless there's some demonstrable palpable error in the factual determinations that the judge made, we have to defer to him. Thank you for the opportunity, Your Honor, to respond to that directly. The trial court's factual findings are rather limited. Those findings, I believe, are contained at page 17, and there are essentially four factual findings that serve as the predicate for the conclusions and imposition of sanctions, and I will submit to this court that, as a matter of law, it was an abuse of discretion to get to the result that Judge Marbley got to based on those factual findings. What were those factual findings? They were that, number one, Mr. Rubble knew because 16 years before 2007, he sent a letter to Bank One. Even the appellees acknowledged that, in a vacuum, a letter that was nearly two decades old perhaps would not be sufficient for the imposition of sanctions. Secondly, Judge Marbley found that a joint inventory that was filed in the Admiralty case years before also demonstrated that Mr. Rubble, in 2007, knew when he communicated to the court that there weren't others. Again, we're talking about what appears to be some tacit acknowledgement of a lack of material difference between and among these inventories. If there is no material difference between them, then I submit to the court that there was not an issue here. There wasn't a separate inventory. It was essentially the same inventory. The third factual finding is that my client inappropriately relied upon his client's communication to him and didn't do enough on his own to confirm it. Keep in mind, we have a CPA for the companies who, under oath, says this is all there is. We have the CEO. We have the board of directors. We have the lawyer going and confirming that the company is having people go through the files. He himself goes through some of them, but not all of them. And in that context, I submit it is an abuse of discretion to conclude that that attorney didn't do enough. He did everything that he could. With regard to that statement about I searched some of the files, is there any kind of follow-up on that by either side in terms of how many, how long, that sort of thing? I don't believe so, Your Honor. And the last is statements that Mr. Rubble made in 2007 to the court where he's communicating and relying upon what his clients have told him that all inventories have been turned over, as well as under oath testimony from the CPA and the board of directors. So to step back and to respond, Your Honor, to your inquiry, in light of the foregoing, I strongly submit that we have met that hurdle of abuse of discretion here. That factual record is insufficient in light of everything we know about this case to turn to the lawyer and his client fled, left him holding the bag, to turn to the lawyer and say, you've got to pay $225,000 out of your own pocket. That is an abuse of discretion. As a technical or legal matter, if you will, the findings on page 17 that you refer to encompass about two paragraphs in there, essentially, that Mr. Rubble knew or should have known the whereabouts of the inventory. The argument in the briefing goes to a number of other things, including the fact that the inventories were important, and Mr. Tigges spoke about that. Your position is that based on the limited findings the judge made, he extrapolated all the other findings into legal conclusions that could not have been supported by those limited things. You say that's your theory? Precisely, Your Honor. And in closing, if I may have 10 seconds, Your Honor, if we get past the intentional aspect of it, and I believe we do, the issue is, should he have known? And on that we have the global tech test that the Supreme Court has set forth for us, and in order to find that somebody has made themselves willfully blind, such that sanctions can be imposed, there has to be a finding that my client took some actions to affirmatively make himself blind of what was going on. There is not a scintilla of evidence in the record to support that finding. Counsel, with respect to those findings on page 17, the statement says your client informed the court his clients had produced all inventories they ever possessed. Is that not a stronger statement that I have been advised by my clients that they've produced X and Y, and that had it been made in that form, at least the court and the adversaries would be on notice that he was not making any assertion on his own as an officer of the court, and then there could have been follow-up? They are certainly different verbiage, Your Honor, and we could probably have an hour-long discussion about the implications of that and what it may mean. Let me say this. My client was not ordered to certify. He certainly had an obligation to be forthright and candid and honest with the court, and we all have that as attorneys. However, to stand in front of the court and to indicate after you've communicated with your client, the board of directors, their CPA, and your client is certified under oath that they've turned over and complied with an order and say, Your Honor, my clients have done what they were supposed to do, and to say it firmly and to say it loudly and to say it definitively, is that sanctionable conduct? Absolutely not, Your Honor. And do you have any addition or contrary view to the statements about the shuffling of the filing cabinets between the two sides and the sons coming in and so on? Two quick thoughts, Your Honor. One, there's insufficient evidence to really conclude anything from that, and two, what the record does show is in 2013 when the receiver took custody of the 36 cabinets, they didn't go through them on premises to 431, 433. They moved them to a warehouse. They were moved. They were shuffled around. They went through them there. Who knows what was where and what cabinet was where? We just simply don't know. In light of the foregoing, I respectfully request that the court reverse the trial court's order concerning sanctions and remand this for proceedings consistent with the foregoing. Thank you for the opportunity. Okay. Thank you. Thank you. Thank you. Mary, please have your seat. Thank you, Glen. No worries. Sure, Tom. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. I already shut that one over there down. Great. Let's just get right in. Shut them down, and then I am going to tell you how to do it. Thank you. Sorry. This one is Norris. What's that? Norris. He and White. Okay. Joe, Tom. Each one is 636, and Bob's goes to 842. Okay. Thank you. Thank you. Thank you.